ADELINE O. SAENA

*v.*

ZENITH OPTICAL COMPANY, *et al.*

(No. 10334)

Submitted April 17, 1951.   Decided May 15, 1951.

*Scherr, Meek & Vinson,* for plaintiffs in error.

*Campbell & McNeer* and *C. F. Bagley, Jr.,* for defendant in error.

GIVEN, JUDGE:

Plaintiff, Adeline O. Saena, instituted this action of trespass on the case in the Circuit Court of Cabell County for recovery of damages for personal injuries, resulting unto her from the breaking or shattering of a glass cof-

feemaker manufactured by defendants. Judgment for plaintiff was rendered upon a verdict of $2,500.00. The coffeemaker was purchased by plaintiff from a retail store in Chicago, Illinois. Defendants manufactured the article at Huntington, West Virginia, and sold it, in its original package, along with a number of other coffeemakers, to a distributor in Chicago, who resold it to the retail store. The declaration charges that defendants knew and intended that the retail store would make sale of coffeemakers to the public, including the plaintiff, "and said defendants knew or should have known that said coffeemakers were imminently dangerous"; that it was the duty of the defendants "to use reasonable care in the manufacturing and assembling of said coffeemakers, and to use reasonable care in the inspecting of the same", and that the defendants "* * * not regarding their duties as aforesaid, carelessly, negligently and improperly manufactured and assembled said coffeemaker thus purchased by the plaintiff, and negligently failed to inspect the same, and as a proximate result of the improper, careless and negligent conduct of the defendants, and each of them, as aforesaid, when the plaintiff on or about the 10th day of April, 1948, was making coffee in said coffeemaker, manufactured and assembled by the defendants as aforesaid, using due and reasonable care for her own safety and following the instructions furnished by the said defendants, said coffeemaker containing hot water and coffee exploded, cracked, broke and shattered, causing the plaintiff to be cut by the glass of which said coffeemaker was made and to be severely burned by the hot water and coffee contained in said coffeemaker so that plaintiff was seriously and permanently injured in and about her head, neck, shoulders, body, arms, legs, hands and otherwise, and said injuries of the plaintiff as aforesaid were the proximate result of the improper, careless and negligent conduct of said defendants, and of each of them. * * *."

It appears that plaintiff, while shopping at a retail store in Chicago, observed a number of glass coffeemakers on

display; that she purchased one of them, took it to her home, but later returned it to the store, for the reason that it was considered unsatisfactory by her husband. At the time she returned the coffeemaker she selected another one from the several coffeemakers on display, which was, by a clerk of the store, replaced in its original carton and delivered to plaintiff, along with instructions and warnings as to its use and care. Plaintiff used the coffeemaker an unknown number of times between the date of purchase, January 16, 1948, to the time of the injuries, April 10, 1948, which injuries occurred at the home of plaintiff in Chicago.

No person other than the plaintiff was present at the time of the injuries. She testified, in effect, that she had at all times used the coffeemaker in exact accordance with the instructions furnished with it by defendants; that at the time of the injuries she was making coffee on a gas stove; that "After the water in the bottom part came to a boil I took the top part and began to insert it into the bottom part. And there is a sort of a suction that you get it into. And then the coffee is to begin to rise. Well, as I was putting it down I didn't quite have it in the suction and the coffee began to come up. And it surprised me, it just shattered, because I knew it wasn't quite in the groove. And here the next thing I knew the glass just shattered and the water that was in the top— the little bit that there was, just splashed on to my stomach and the glass that shattered, it just shattered in little pieces and it cut my hand, my right wrist." The injuries were severe. There was a transverse laceration across the anterior portion of the wrist, just above the wrist joint. Four tendons and the median nerve were severed. In the opinion of the physician who treated her, some permanent disability resulted.

The coffeemaker consisted of a lower glass bowl or server and upper glass bowl and a glass filter. Only the upper glass bowl was broken. To make coffee, water is placed in the lower bowl and brought to a boil. Ground coffee is placed in the upper bowl and pressure, devel-

oped in the lower bowl by the boiling water, forces water through the filter tube into the upper bowl, where it mixes with the coffee grounds. The coffee then drains back through the filter tube into the lower bowl after the pressure in the lower bowl is reduced. The upper bowl remains open and is supposedly designed to fit into the opening of the lower bowl so as to prevent excess pressure in the lower bowl.

Defendants admit that they manufactured the coffeemaker in question under the trade name "Fireglas", and that it was one of a number of coffeemakers sold by them to the Chicago distributor, who resold it to the retail store. Each coffeemaker was assembled at the factory in Huntington, placed in an individual carton and repacked in a master carton. Defendants offered evidence to the effect that the coffeemakers manufactured by them were manufactured in strict accordance with the best known methods and from materials universally used by manufacturers of such glassware; that each coffeemaker was subjected to repeated tests and inspections; that such tests were "standard and accepted manufacturing procedure" in the manufacture of glass coffeemakers; that any coffeemaker found by any test to be defective was discarded and that "* * * out of all the coffeemakers we have made, percolators also, this is the first I have ever heard of" blowing up.

Certain statements, instructions and warnings accompanied each of the coffeemakers. We think the following quotations sufficiently inform as to the nature and character thereof:

"THE FASCINATING STORY OF FIREGLAS . . . The Zenith Optical Division of Polan Industries has long been recognized as a company noted for its achievements and developments in the field of special glasses. As a result Polan Industries was called upon to produce much of the glass used in the war effort. Typical of the many problems in glass was the production of a lens for a naval

range finder which could sight a spot on the mast of an enemy ship ten miles away and give the distance accurately to a fraction of an inch! So, too, with Fireglas which, after successfully meeting such requirements as a temperature of 2000 degrees and unusually severe shock tests, was used in much of the radar and electronic equipment. Fireglas has since returned to civilian life with an amazing service record on land, sea, and in the air. Fireglas which served you in war, now serves you in peace. FIREGLAS is the registered trade mark of Polan Industries."

"CARE OF YOUR FIREGLASS COFFEEMAKER MEANS LONG LIFE . . . 1. Do not place your empty server over the flame or electric plate, or allow your server to boil dry. Use medium heat. 2. Do not allow any of the glass parts to come into contact with cold water, wet cloths, or cold surfaces while they are still hot. 3. Do not use the server for deep fat frying. 4. Stains or deposits may be easily removed by boiling in water containing a tablespoon of baking soda, or a little vinegar. 5. If your electric range is a 1940 model or later, always use an asbestos pad or wire rack between the coffeemaker and the heating element."

"Guaranteed For One Year. If within one year of purchase any of the glass parts should break due to heat, your dealer will replace the parts, providing the coffeemaker has been used according to instructions. Merely return the broken pieces to your dealer."

"Be sure all FIREGLAS vessels contain some liquid before they are placed over flame. Do not allow any hot glass part to come in contact with cold water, wet cloths or wet surfaces. Do not use for deep fat frying. Do not allow food to stick; stir from bottom several times. Do not let flame go above the water line. To eliminate mineral deposits wash out with soap and hot water. If not clean fill vessel half full hot water and add one tablespoon of vinegar. Boil for a few minutes and wash with soap and hot water."

"THOROUGHLY TESTED . . . LIBERALLY GUAR-ANTEED. Every piece of FIREGLASS has undergone innumerable tests for perfect uniformity in size and thickness, plus the special Enduro-proofing which enables it to vigorously withstand breakage not only from heat but from blows as well. This makes possible the liberal guarantee which goes with all FIREGLAS products. For cooler and more attractive kitchens, FIREGLAS is the ideal top of stoveware."

"EVERY ITEM FULLY GUARANTEED When Used According to Our Directions. Under the terms of our guarantee we replace any glass part found defective due to the application of heat . . . if used according to our directions. Should heat breakage occur within one year from purchase, take the defective glass part to your dealer for his inspection and replacement."

After the completion of the evidence the following motion was made: "The defendants move the court to direct the jury to return a verdict in favor of the defendants for the reason that no evidence of negligence has been shown on the part of the defendants and that under the proof no inference of negligence arises which supports a verdict for the plaintiff." This motion being overruled, the court gave to the jury, over objections of defendants, plaintiff's Instructions Nos. 1 and 2, which read:

"PLAINTIFF'S INSTRUCTION NO. 1.

"The court instructs the jury that since the accident involved in this case occurred in the State of Illinois the law of that state governs as to whether or not Plaintiff is entitled to recover, and it is the law of that state that when an article is made by a manufacturer for others, and the manufacturer is negligent in the manufacturing of such article, and by reason thereof persons using the same are likely or liable to be injured, such manufacturer is liable to a person who suffers injury through such negligence, while using such article in a proper manner, and this is true even though there be no privity of contract between the manufacturer and such person."

"PLAINTIFF'S INSTRCTION NO. 2.

"The Court further instructs the Jury that the parties hereto have stipulated and agreed that the coffee-maker described by the Plaintiff in her declaration was manufactured by the Defendants and therefore no proof of this fact is required; and you are further instructed that if you find from a preponderance of the evidence that the Plaintiff, at the time of the accident involved in this case, was using said coffee-maker with due care and in accordance with instructions furnished by the Defendants, and that while so using said coffee-maker it shattered or broke, you have the right to infer that such shattering or breaking of said coffee-maker resulted from negligence of the Defendants in the manufacture of said coffee-maker."

In the circumstances of this case the law of the State of Illinois governs as to the substantive rights of the parties. *Dallas* v. *Whitney,* 118 W. Va. 106, 188 S. E. 766; *Schade* v. *Smith,* 117 W. Va. 703, 188 S. E. 114; *Wood* v. *Shrewsbury,* 117 W. Va. 569, 186 S. E. 294; *Clise* v. *Prunty,* 108 W. Va. 635, 152 S. E. 201; 15 C. J. S., Conflict of Laws, Section 12. This Court takes judicial notice of the law of Illinois, as it relates to such rights. Code, 57-1-4. The law of West Virginia, however, governs as to matters of remedy and procedure, 4 M. J., Conflict of Laws, Section 37; 15 C. J. S., Conflict of Laws, Section 22.

We are of the opinion that defendants' motion for a directed verdict should have been sustained and that the giving of the two quoted instructions constituted prejudicial error. There is a complete absence of any facts from which a jury could infer any negligence in the manufacturing of the article, or in the inspection thereof. The defect in the article, if any existed, was not shown. Neither is it attempted to be shown that, by any known manufacturing process, it is possible to produce such an article free from any defect, or that such a defect, if any existed, could have been discovered by any known method of inspection. Could not a defect have developed

in the article during its approximate three months' use by plaintiff?

In *Cyrus* v. *Montgomery Ward*, 171 Ill. App. 355, decided in 1912, the defendant, manufacturer of a balance wheel used on a saw frame, was held liable for injury to a remote purchaser resulting from the bursting of the balance wheel. It was shown to the jury that the balance wheel was imperfectly molded. "After the accident it was found that along the lines of the break the balance wheel was rough and filled with pores, and upon the trial it was referred to as 'in a honey-combed condition, having along the line of break, numerous pores that came to the surface, resulting in the defective part appearing like a sponge.' These alleged defects, however, had been covered over and filled with black paint, concealing them. Two holes had also been bored in the rim, for the purpose of balancing the wheel. The break began at these holes and passed through the parts where the pores were thickest and largest." Here facts were established from which negligence in the manufacture of the article could be inferred.

In *Lill* v. *Murphy Door Bed Co.*, 290 Ill. App. 328, 8 N. E. 2d 714, plaintiff was held entitled to recover for injuries resulting from the breaking of metal castings, parts of the bed. Plaintiff was a tenant of a trust company which had purchased the bed from the defendant manufacturer. It was shown that the manufacturer knew, or by reason of proper inspection should have known, of the defect. It was "pointed out where the pipe had broken that the paint had run through the crack on the metal on the inside of the pipe * * *."

In *Crandall* v. *Stop & Shop*, 288 Ill. App. 543, 6 N. E. 2d 685, plaintiff was injured in attempting to open a jar of preserves by loosening the spring clamp which held the jar cover in place. Plaintiff had never previously opened a jar so sealed, and no instructions of any kind accompanied the article. Recovery was denied, the Court holding, Point 1, headnote: "Where plaintiff bases cause of

action on negligent breach of duty which defendant owes plaintiff, burden is on plaintiff to prove negligence charged."

In *Lindroth* v. *Walgreen Co.,* 407 Ill. 121, 94 N. E. 2d 847, decided by the Supreme Court of Illinois in 1950, the action was against Walgreen Company, a retailer, and the Knapp-Monarch Company, the manufacturer of an electric vaporizer, for injuries resulting from burns. It appeared that the vaporizer had been manufactured and sold without a thermal automatic cutout. Within about forty-five minutes after its first use the metal container melted, causing the fire. It was proved "that a properly constructed vaporizer could not melt itself down * * *." The holding of the Court, Point 1, was: "In action against retailer and manufacturer of electric vaporizer for burns sustained by infant when vaporizer allegedly became overheated because of an alleged defect and set fire to nearby objects, there was no presumption or inference that retailer or manufacturer were responsible for the fire because of the mere fact that fire occurred." In the opinion the Court stated: "* * * The mere fact that the fire occurred, resulting in an injury to appellee, does not authorize the presumption or inference that the appellants or either of them were responsible therefor. The burden was on the appellee to prove that the vaporizer caused the fire. Huff v. Illinois Central Railroad Co., 362 Ill. 95, 199 N. E. 116; Rotche v. Buick Motor Co., 358 Ill. 507, 193 N. E. 529; Bowman v. Woodway Stores, Inc., 345 Ill. 110, 177 N.E. 727." The *Lindroth* case was before the appellate court of Illinois on a previous appeal, and that Court was careful to point out that the doctrine of *res ipsa loquitur* did not apply.

Decisions of this Court dealing with similar cases are to the same effect. See *Wright* v. *Valan,* 130 W. Va. 466, 43 S. E. 2d 364; *Holley* v. *Baking Co.,* 128 W. Va. 531, 37 S. E. 2d 729; *Blevins* v. *Bottling Co.,* 121 W. Va. 427, 3 S. E. 2d 627; *Parr* v. *Bottling Works,* 121 W. Va. 314, 3 S. E. 2d 499; *Webb* v. *Tobacco Co.,* 121 W. Va. 115, 2 S. E. 2d 898; *Jones* v. *Bridge Co.,* 70 W. Va. 374, 73 S. E. 942; *Veith* v.

*Salt Co:,* 51 W. Va. 96, 41 S. E. 187, 57 L. R. A. 410. One of the leading cases considering the questions arising in this type of case is *MacPherson* v. *Buick Motor Co.,* 217 N. Y. 382, 111 N. E. 1050, L. R. A. 1916F 696, Ann. Cas. 1916C, 440. See annotations 17 A. L. R. 672; 39 A. L. R. 992; 63 A. L. R. 340; 88 A. L. R. 527; 105 A. L. R. 1502; 111 A. L. R. 1240; 140 A. L. R. 191; 142 A. L. R. 1490; and 164 A. L. R. 569.

In *Wright* v. *Valan, supra,* this Court applied the doctrine of *res ipsa loquitur* "* * * when an instrumentality under the control of an employee of the defendants causes a sudden fire which damages or destroys nearby property of the plaintiff and the fire is such as, in the ordinary operation of the instrumentality, does not happen if the person in control exercises due care.". Point 1, syllabus. In *Holley* v. *Baking Co., supra,* where a cake sold in its original package contained a foreign substance causing injury, this Court held that no presumption of negligence existed but that the jury "may infer that plaintiff's injury either did or did not result from defendant's negligence in the manufacture of its product." We think these cases, as well as the cases from Illinois, demonstrate that no presumption of negligence in the manufacture or inspection of an article arises from the mere fact of an injury arising from the use of the article, even though it be immediately dangerous.

The judgment of the trial court is reversed, the verdict of the jury is set aside, and the case remanded for a new trial.

*Reversed;*
*verdict set aside;*
*new trial awarded.*